404 So.2d 1313 (1981)
INTERNATIONAL INSURANCE COMPANY, Plaintiff-Appellant,
v.
Charles D. MASUR and Reliance Insurance Company, Defendants-Appellees.
No. 14647.
Court of Appeal of Louisiana, Second Circuit.
September 29, 1981.
*1314 Davenport, Files, Kelly & Marsh by William G. Kelly, Jr., Monroe, for plaintiff-appellant.
Theus, Grisham, Davis & Leigh by J. Michael Hart, Monroe, for defendant-appellee, Charles Masur.
Brittain & Williams by Joseph Payne Williams, Natchitoches, for defendant-appellee, Reliance Ins. Co.
Before PRICE, MARVIN and FRED W. JONES, Jr., JJ.
MARVIN, Judge.
In this declaratory judgment action under LRS 22:1406 D(1), defendant, the uninsured motorist insurer, appeals a judgment decreeing that uninsured motorist coverage is $750,000 rather than $25,000 which is the amount the insurer contends was selected by the named insured in lieu of the statutorily provided amount equal to the liability limits of the policy ($750,000).
Section 1406 D(1)(a) requires that uninsured motorist coverage in an automobile liability insurance policy shall be not less than the limits of bodily injury liability provided by the policy unless a named insured rejects in writing the coverage or selects lower [uninsured motorist] limits. This subsection also provides that any document signed by the named insured which initially rejects UM coverage or selects lower limits shall be legally effective whether or not that document is physically attached to the policy.[1]
*1315 The lower court held that the selection of lower UM coverage had to be both in writing and signed by the named insured, notwithstanding a finding by the lower court that the insured selected and intended, and the policy, as written and delivered before the accident here in question, provided, that the UM coverage be lower limits of $25,000 rather than the $750,000 bodily injury liability limits. We affirm.
The policy in question was effective for the one year period beginning October 1, 1978. The named insured is Monroe Scrap Materials, Inc., which, in earlier policy periods with other liability insurers, had selected $750,000 liability coverage and $25,000 UM coverage.
Before October 1, 1978, the corporation asked the Seymour Insurance Agency to review its insurance policies and make proposals to provide insurance coverage for Monroe Scrap.
Seymour discussed the matter with Meyer Weldman, majority stockholder and chief executive of the corporation, with Charles Masur, a minority stockholder, an officer of the corporation and manager of its scrap operation, and with Meyer Weldman's secretary of 35 years, Mrs. Holden, who was also office manager of the corporation. Charles Masur, Meyer Weldman's son-in-law, who was seriously injured in an automobile accident about three months after the policy was written, is a claimant-defendant in this action.
Seymour understood that Monroe Scrap desired the same liability insurance coverages it had before, including the $25,000 UM coverage and $750,000 liability coverage. Masur gave Seymour copies of prior policies. Masur also gave Seymour a copy of a current proposal by a competing insurance company (Liberty Mutual) showing the same proposed coverages of $750,000 liability and $25,000 UMC. The Seymour proposal contained the same limits. It was also shown that Masur himself signed a written selection of $25,000 UM coverage for Monroe Scrap in the policy written by another agency and another insurer for the preceding policy periods beginning October 1, 1976.[2] Masur also authorized Seymour to obtain experience rating data on Monroe Scrap from the Louisiana Insurance Rating Commission in a letter to the commission dated August 29, 1978.
The Seymour proposal of September 27, 1978, to Monroe Scrap is detailed and compares its premiums with the Liberty Mutual premiums for workers' compensation coverage, comprehensive general liability, and comprehensive automobile liability. The Seymour proposal on Monroe Scrap's desired coverages in the comprehensive automobile liability policy reads as follows:

 "COMPREHENSIVE AUTOMOBILE LIABILITY
 ----------------------------------
"Comprehensive Auto Liability: "$750,000 Single Limit Liability
including Owned,
Non-Owned & Hired Automobiles 2,000 Medical Payments
 25,000 Uninsured Motorists
"Physical Damage Coverages: "Based on Expiring Auto Policy
 Schedule as we [do] not
 have an updated Fleet Schedule.
 To be adjusted per insured's
 requirements."

*1316 The discussion with Seymour by Monroe Scrap executives led Seymour to understand that Monroe Scrap desired the same liability and UM coverages it had in prior years.
Seymour's proposal was verbally accepted by Monroe Scrap, and in letters of September 29, 1978, Monroe Scrap informed both the Southeastern Compensation Rating Bureau and the Louisiana Insurance Rating Commission to recognize Seymour as agent of record for Monroe Scrap on all insurance matters. A temporary insurance binder that was given to Monroe Scrap by Seymour about September 28, 1978, effective October 1, 1978, and the policy that was delivered by Seymour to Monroe Scrap about October 17, 1978, each expressly provided the $750,000 automobile liability limits and the $25,000 UM limits.
Before the policy was delivered to Monroe Scrap, the insurer directed Seymour on October 12, 1978, to obtain the signature of Monroe Scrap on the UM selection form which accompanied the policy. Through inadvertence, the UM selection form was returned to Seymour unsigned. On December 15, 1978, Mr. Seymour was again reminded of these events by his commercial accounts manager. On January 8, 1979, Seymour's manager mailed, among other things, a UM selection form to Mrs. Holden at Monroe Scrap with this instruction:
"Also, I am attaching `Uninsured Motorists Protection Option Selection Form' which I would appreciate your getting signed by Mr. Weldman and returning to my attention ..."[3]
*1317 On January 9, 1978, at Weldman's instruction, Mrs. Holden signed Mr. Weldman's name to the UM selection form on behalf of the corporation, and returned the form to Seymour. Mrs. Holden testified that it was an oversight that the form had not been signed when the policy was delivered.
On January 6, 1979, Masur sustained bodily injury in an automobile accident and made claim for $750,000 under the UM coverage against the insurer of Monroe Scrap, who then brought this action for a declaratory judgment. This action, filed earlier in 1980, was tried in December 1980. Meyer Weldman died before trial.

THE LAW
Much has been written about UM coverage by the courts, the legislature, and others since its inception in Louisiana by Act 187 of 1962. See generally § 1406 D(1) as annotated, LSA-LRS Title 22, and Shepherd's citations. Dozens of amendments and reenactments and scores of cases have considered problems of UM coverage.
UM coverage first became statutorily mandated under Act 187 of 1962, but this Act provided that the statutory UM coverage was not applicable where the insured "shall reject the coverage." To this rejection provision, the legislature added the selection disjunctive by Act 154 of 1974. This Act provided that the statutory UM coverage would not be applicable where the insured "shall reject the coverage or selects lower limits."
By Act 438 of 1977 the legislature inserted in this provision before the disjunctive or, the modifier in writing, so that the provision now reads that the statutory UM coverage shall not apply where the insured "shall reject in writing the coverage or selects lower limits."
Section 1406 D(1)(b) was added to the statute by Act 137 of 1972 to allow an insured who had selected lower than statutory limits of UM coverage to increase that coverage in his policy at his written request. After Act 623 of 1977 an insured may require his insurer to increase UM coverage in his policy to any amount the insured requests in writing.
LRS 22:628 originally superimposed on UM coverage the general rule that no agreement modifying coverage shall be valid unless the agreement is in writing and is made a part of the policy by physical attachment. Act 438 of 1977 adopted a special rule for UM coverage by providing that any document signed by the insured that initially rejects UM coverage or selects lower limits shall be conclusively presumed to be a part of the policy, irrespective of whether physically attached to the policy. This part of Act 438 of 1977 was apparently designed to overcome the effect of the question of § 628 in cases such as LeBoyd v. Louisiana Transit Co., 375 So.2d 749 (La. App. 4th Cir. 1979). There the policy and injury in question arose in 1974-75. The insured had rejected UM coverage in writing in an earlier policy but this written rejection was not made a part of the policy then in effect. The insured had verbally rejected UM coverage under the 1974-75 policy. The court applied § 628 and found statutory UM coverage. See Turner v. Allstate Ins. Co., 368 So.2d 797 (La.App.2d Cir. 1979).
The pertinent provisions of § 1406 D(1)(a) now read as follows (paragraphed for clarity):
"... the [statutory UM] coverage ... shall not be applicable where any insured... shall reject in writing the coverage or selects lower limits.
"Such coverage need not be provided in... a renewal or substitute policy where the ... insured has rejected the coverage or selected lower limits in ... a policy previously issued to him by the same insurer.
"Any document signed by the ... insured... which initially rejects such coverage or selects lower limits shall be conclusively presumed to become a part of the policy ... when issued or delivered, irrespective of whether physically attached thereto."
In Page v. American Motorist Ins. Co., Ltd., 381 So.2d 889 (La.App. 2d Cir. 1980), *1318 we held that the last quoted provision by Act 438 of 1977 amending 1406 D(1)(a), with reference to a document signed by the insured rejecting UM coverage and not attached to the policy, was remedial legislation and was to be applied retroactively. In other cases we noted the strong legislative policy of statutory UM coverage. Walker v. Coleman, 367 So.2d 395 (La.App.2d Cir. 1979), writ denied; Turner, supra.
In A. I. U. Ins. Co. v. Roberts, 395 So.2d 375 (La.App. 1st Cir. 1981), before Act 438 of 1977, the plaintiff verbally selected UM limits lower than statutorily provided and then claimed that she should be entitled to the larger statutory limits because she did not consent to the lower limits in writing. The court held that her verbal selection of lower limits was legally effective and that the 1977 amendment requiring the selection of lower limits to be in writing would not be retroactively applied. Writs were granted by the Louisiana Supreme Court on May 31, 1981, and that case is yet pending there. A. I. U. Ins. Co. v. Roberts, 399 So.2d 620 (La.1981).
While A. I. U. Insurance concerned only the application of § 1406 D(1)(a) before the 1977 amendment, that opinion observed that after the amendment, the selection of lower limits of UM coverage would be required to be in writing to be effective. Until this observation, the courts had dealt with only the question of rejection of the statutory UM coverage. Courts had consistently held that the statutory UM coverage must be read into the policy and that no agreement modifying coverage would be effective unless that agreement was in writing and made a part of the policy. Section 628 was held to have made this requirement before the 1977 amendment added the in writing modifier to the word reject. § 1406 D(1)(a). These holdings were predictable because of the general rule of § 628 that no agreement modifying the coverage of any contract of insurance shall be valid unless in writing and made a part of the policy and the determination that § 1406 D(1)(a) mandates the inclusion of UM coverage in an amount equal to the bodily liability coverage in every policy of automobile liability insurance issued in Louisiana. See LeBoyd, Walker, cited supra.
Certainly there is a strong indication that the insured selected lower UM limits if the policy itself contains the lower limits. It is also logical, and supportive of the apparent legislative distinction between shall reject in writing the coverage and select [not in writing?] lower limits, that evidence of selection of lower UM limits extraneous to the policy should be admitted because this evidence would not be modifying the coverage of the policy. On the one hand, the policy is silent, as in cases of rejection of the coverage, while on the other, the policy contains UM coverage but in lower than statutory limits.
Notwithstanding the legislature's failure to insert the modifier in writing where it would apply to both the selection and the rejection of the statutory UM coverage, the above argument, however tenable, must fall when the many cases and amendments to § 1406 D(1) are considered. First there is the general pronouncement and strong policy of the statute that no automobile liability insurance policy shall be issued in this state unless UM coverage is provided in not less than the limits of bodily injury liability. § 1406 D(1)(a). Secondly, there are the case pronouncements that the UM coverage is made a part of the policy by the statute and that the coverage is to be determined by the policy and the statute. LeBoyd, Walker, supra. This coverage before the passage of Act 438 of 1977, could not be modified except as § 628 provided. After Act 438 of 1977, the UM coverage can be modified only as provided by that act, the pertinent part of which we emphasize:
"Any document signed by the ... insured... which initially rejects such coverage or selects lower limits shall be conclusively presumed to become a part of the policy ... when issued ... irrespective of whether physically attached thereto." § 1406 D(1)(a), in part.
Thus we conclude that if the statutory UM coverage is to be modified (anything less than the bodily injury limits of the automobile liability policy, whether to *1319 no coverage or to lower limits), § 1406 D(1)(a) as amended, requires that the modification be shown by a document signed by the insured, whether that document is or is not attached to the policy.
Notwithstanding the showing here that this insured desired and selected the lower limits of UM coverage than statutorily provided, there was no showing that the insured signed a document modifying the statutory limits before the date of the bodily injury asserted as the basis for claiming the UM coverage. That part of the policy which provides the lower limits of course can be considered as a document, but that document was not signed by the insured until after the claimant-defendant's cause of action arose.
The legislature has declared that liability policies are executed for the benefit of the injured persons to whom the insured may be liable. LRS 22:655. The driver of an uninsured or underinsured automobile is fictitiously an insured under the UM coverage. Hartzog v. Eubanks, 200 So.2d 303 (La.App. 1st Cir. 1967), writ denied. Proper modification of statutory UM coverage shall be applied prospectively and not retroactively to the detriment of third party beneficiaries of the coverage whose causes of action arise before the fact of the modification. See Manchester Insurance & Indemnity Company v. Jones, 317 So.2d 786 (Fla.App.3d Dist. 1975).
At appellant's cost, judgment is AFFIRMED.
NOTES
[1] Pertinent provisions of LRS 22:1406 D(1) read as follow:

"D. The following provisions shall govern the issuance of uninsured motorist coverage in this state.
"(1)(a) No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy, under provisions filed with and approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; provided, however, that the coverage required under this Subsection shall not be applicable where any insured named in the policy shall reject in writing the coverage or selects lower limits. Such coverage need not be provided in or supplemental to a renewal or substitute policy where the named insured has rejected the coverage or selected lower limits in connection with a policy previously issued to him by the same insurer. Any document signed by the named insured or his legal representative which initially rejects such coverage or selects lower limits shall be conclusively presumed to become a part of the policy or contract when issued and delivered, irrespective of whether physically attached thereto.
"(b) Any insurer delivering or issuing an automobile liability insurance policy referred to herein shall also permit the insured, at his written request, to increase the coverage applicable to uninsured motor vehicles provided for herein to any amount."
[2] The admissibility of the selection form signed by Masur for the corporation was objected to generally on grounds of irrelevancy. We consider that the selection form was admissible and was relevant to corroborate testimony that Monroe Scrap desired and requested the same $25,000 UM limits in the 1978-79 policy period as had been provided by another insurer in preceding policy periods.
[3] This correspondence reads:

[Interoffice Memo to Ed Seymour, Jr.]
"Client-Monroe Scrap Materials, Inc.
"Subject-Several Items to be handled
"We had left an `A-Rate' form to be signed by insured for the rates on Contractual Liability with Continental Can and they sent it back to us with letter saying they do not do business with Con'l Can but if they resumed they would advise.
"With that letter they also attached the UM Selection form but they had not signed it. They must have thought it went with the Contractual A-Rate consent form. Please get this signed and return to me. I wrote C&F back to delete the wording `Contracts with Continental Can [C]ompany' and to reissue the form on If Any basis and we would have the insured sign the corrected form.
"See letter from C&F attached as concerns inspection at Shreveport Location. Advise
"Also attached is endorsement adding 30 day notice to Int'l Paper in Bastrop as requested and copy of the Certificate of Insurance I sent to IP with a copy of the endorsement for their files.
"Thanks,
"Nina
"P. S. Give Payroll Report Copy to Mrs. Holden."
"January 8, 1979
"Mrs. Dorothy Holden
"Monroe Scrap Materials, Inc.
"P. O. Box 2821
"Monroe, LA 71207
"Dear Mrs. Holden:
"Enclosed please find Payroll Report and Billing which should coincide with the October Payroll Report you sent in for Monroe operations. I have explained to the company that these figures represented October only in lieu of the requested October and November payrolls and I added the November payroll information on the copy of the Shreveport Payroll Report and I attach copy of this report for your file. In the future, I have requested the company to issue separate reports for Monroe and Shreveport and to send them to me directly and I will forward to your attention. The completed reports should in turn be forwarded back to me for processing on to the company. If you have any questions, please let me know. It may take a little time to get the company to handle this as we asked.
"Also, I am attaching `Uninsured Motorists Protection Option Selection Form' which I would appreciate your getting signed by Mr. Weldman and returning to my attention. Again, if you have any questions, please give me a call at the above number.
"The endorsement and certificate in favor of International Paper Company is for your file. We have forwarded copy of this information to IP in Bastrop.
* * * * * *
"Sincerely yours,
"SEYMOUR INSURANCE AGENCY, INC.
"Nina G. Cassidy, CPIW
"Commercial Accounts Manager"
"DATE 10-12-78
"Re: 130 055 6862
"Monroe Scrap Material
"From Seymour Insurance Agency
 P.O. Box 5050
 Monroe, LA
"Please have the attached `UM Option' signed and return the underwriting copy to our office.
"Thank you,
"Sue Larson
"REPLY
"Suesee attachedsorry for delay
"Reply date 1/17/79
"Signature Nina Cassidy"